**MONSANTO COMPANY, a corporation of the State of Delaware, Plaintiff Below, Appellant,**

v.

**INTERNATIONAL INSURANCE COMPANY (EIL), Defendant Below, Appellee.**

**No. 162, 1994.**

Supreme Court of Delaware.

Submitted: Oct. 13, 1994.
Decided: Nov. 7, 1994.
Revised: Dec. 23, 1994.
Revised and Rehearing Denied
Dec. 23, 1994.

Charles S. Crompton, Jr., Richard L. Horwitz, and Peter J. Walsh, Jr., Potter, Anderson & Corroon, Wilmington, Jerold

Oshinsky, Anderson, Kill, Olick & Oshinsky, Washington, DC, of counsel; John M. Bray (argued), and David J. Curtin, Schwalb, Donnenfeld, Bray & Silbert, Washington, DC, of counsel, for appellant.

James W. Semple, Morris, James, Hitchens & Williams, Wilmington, Frederick Brown (argued), James Hughes, Orrick, Herrington & Sutcliffe, San Francisco, CA, of counsel, for appellee.

Before VEASEY, C.J., HOLLAND and HARTNETT, JJ.

VEASEY, Chief Justice:

In this interlocutory appeal from the Superior Court, we consider whether Missouri law [1] permits the introduction of extrinsic evidence to interpret an unambiguous, integrated insurance contract. The plaintiff-appellant, Monsanto Company ("Monsanto"), seeks the introduction of parol evidence in this case, and a resultant declaratory judgment that it has coverage from defendant below-appellee, International Insurance Company ("IIC"), for pollution claims. The Superior Court held that Missouri law prohibits the introduction of parol evidence for interpretive purposes and granted summary judgment to IIC. The court found that a certain environmental insurance policy exclusion was clear on its face and precluded coverage for environmental damage caused by "sold waste streams." [2] Monsanto appealed this ruling. After careful review of all relevant Missouri authorities, we have determined that the Superior Court misinterpreted Missouri law with regard to consideration of parol evidence in this insurance contract

setting. We therefore **REVERSE** the ruling of the Superior Court and **REMAND** the case for proceedings consistent with this opinion.

## I. FACTS

The Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri. Monsanto manufactures chemical and agricultural products, pharmaceuticals, industrial process controls and consumer products at sites throughout the country.

Since the late 1930s, Monsanto has purchased separate liability insurance policies to provide coverage for property damage and bodily injuries caused by manufacturing-related pollution. The insurance program is composed of a primary policy, an umbrella policy, and several layers of excess policies. The excess policies are designed to cover liability and defense costs after primary coverage is exhausted.

Monsanto obtained its primary policies from Travelers Indemnity Company ("Travelers"), Liberty Mutual Insurance Company ("Liberty Mutual") and the Insurance Company of North America ("INA"). Additionally, Monsanto secured environmental impairment liability from International Insurance Company ("IIC"). Monsanto acquired its umbrella policies from Certain Underwriters at Lloyd's, London and London Market Insurance Companies ("London Companies"). Finally, Monsanto purchased its excess policies from thirty-two other insurance companies.[3]

---

1. Pursuant to a Superior Court order dated October 29, 1991, the "law of the case" in this proceeding is that the coverage issues in this and related cases will be resolved under the law of Missouri.

2. "Sold waste streams" refer to streams of waste sold by Monsanto to a third party.

3. The thirty-two insurance companies are: Aetna Casualty and Surety Company, Allstate Insurance Company, American Manufacturers Mutual Insurance Company, American Home Assurance Company, American Centennial Insurance Company, Appalachian Insurance Company, Associated International Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, C.E. Heath Compensation and Liability Insurance Company, California Union Insurance Company, Columbia Casualty Company, Continental Casualty Company, Employers Insurance of Wausau (Wausau Underwriters Insurance Company), Fireman's Fund Insurance Company, First State Insurance Company, Granite State Insurance Company, Hartford Accident and Indemnity Company, The Home Insurance Company, Hudson Insurance Company, Insurance Company of the State of Pennsylvania, Lexington Insurance Company, National Union Fire Insurance Company, National Casualty Company, New England Insurance Company, North Star Reinsurance Corporation, Northwestern International Insurance Company, Pacific Employers Insurance Company, Protective National Insurance Company of Omaha, Royal Indemnity Company,

As part of its operations, Monsanto produced toxic wastes which it either stored, disposed of, or contracted for storage or disposal at different waste disposal sites throughout the United States. Twelve of these sites have been selected as Phase I sites. Five of these sites have been selected as Trial Group I sites ("Group I"). These five sites are Motco, Brio, North 80, South 20 and Texas City, all of which are located in and around Texas City, Texas.

At issue in this appeal is Monsanto's environmental impairment liability policy with IIC and the policy's relation to the Brio site. The Brio site, upon which both Brio Refining, Inc. ("BR") and Dixie Processors ("DP") operated, is located in Harris County, Texas. BR operated from 1956 to 1982, and was involved in the regeneration of copper catalysts and the recovery of petrochemicals and other chemicals from still bottoms. Waste materials from various companies were stored in twenty pits at the site. Monsanto sold styrene tars to the BR owners between 1957 and 1980. DP began operations in 1969, and has been used for the recovery of copper and hydrocarbon washing. Six pits are currently being used to store waste. Monsanto sold various materials to the DP operators from 1978 to 1980.

In May 1984, the Texas Department of Water Resources recommended that the Environmental Protection Agency ("EPA") add the Brio site to the Superfund National Priorities List, which the EPA did in October of that year. On October 24, 1984 the EPA served Monsanto with a demand letter which named it as a potentially responsible party. In December 1984, residents of the surrounding area served Monsanto with a demand letter alleging various bodily injuries and property damages resulting from exposure to toxic wastes. On May 14, 1985, Monsanto entered into an agreement with the EPA to clean up the Brio site and signed an "Administrative Order of Consent."

St. Paul Surplus Lines Insurance Company, Unigard Security Insurance Company, and United States Fire Insurance Company.

■ Monsanto's IIC policy at issue was effective July 15, 1983 through July 15, 1984. The policy provides, in pertinent part:

This Policy shall not apply to or include Liability for, nor costs and expenses of or in connection with:—

7. Environmental Impairment arising from:—

(a) any commodity, article or thing supplied, repaired, altered or treated by the Insured and happening elsewhere than at the Insured's premises after the Insured has ceased to own and exercise physical control over that commodity, article or thing supplied, repaired, altered or treated.

("Exclusion 7(a)").

Prior to purchasing the IIC environmental impairment liability policy, Monsanto contacted IIC's domestic broker, Richard Sears ("Sears"), to resolve some uncertainty it had with regard to Exclusion 7(a). Specifically, Monsanto was unsure whether Exclusion 7(a) applied to situations factually similar to that of the instant case, i.e., whether the terms "commodity, article or thing" included sold waste streams.

Sears contacted Kenneth Roberts ("Roberts"), the London broker responsible for the sale of environmental liability policies, who in turn contacted Malcolm Aickin ("Aickin"), the underwriter of IIC's environmental liability policies. Aickin, in a series of letters, telexes and phone calls, assured Monsanto that the exclusionary language in Exclusion 7(a) did not apply to waste streams.[4]

## II. PROCEEDINGS IN THE SUPERIOR COURT

IIC moved for summary judgment. It maintained that the clear language of Exclusion 7(a) precluded coverage of "sold waste streams" and therefore, of Monsanto's claims. Moreover, IIC contended that Exclusion 7(a) is unambiguous. Therefore, it was argued that extrinsic evidence was inadmissible. Monsanto, on the other hand, ar-

4. Both Sears and Roberts testified that there was no need to attach an explanatory endorsement to the policy, as the underwriter's written interpretation was viewed in the industry as "good as gold."

gued that pre-contract communications were part of the contract because the communications induced Monsanto to purchase the contract, and extrinsic evidence was admissible under Missouri law to prove that Exclusion 7(a) was not meant to exclude coverage. The Superior Court held that the contract between Monsanto and IIC was both unambiguous and integrated. Based on its finding that Missouri law prohibits the admission of extrinsic evidence as to integrated and unambiguous insurance contracts, the court refused to admit Monsanto's extrinsic evidence and granted IIC summary judgment.

## III. MISSOURI LAW

■ Missouri law is clear regarding the admissibility of extrinsic evidence relating to contracts. Under Missouri law, courts may consider extrinsic evidence that interprets all or a portion of the relevant contract. This rule stands even if the contract was unambiguous:

> The court in interpreting words or other acts of the parties puts itself in the position which they occupied at the time the contract was made. In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement.

*Cure v. City of Jefferson,* Mo.Supr., 380 S.W.2d 305, 310–311 (1964).

This rule also holds even if the contract was integrated:

> The parol evidence rule as a principle of substantive law prohibits the *contradiction* of integrated contracts. It simply does not apply to parol testimony that does not contradict the certain terms of an integrated agreement.... Even a complete and integrated contract must be interpreted.

*Gibson v. Harl,* Mo.App., 857 S.W.2d 260, 269–70 (1993). *Accord Wulfing v. Kansas City S. Indus.,* Mo.App., 842 S.W.2d 133, 147 (1992) ("Evidence of agreements or negotiations prior to or contemporaneous with the adoption of a writing are admissible ... to establish the meaning of the writing, whether or not integrated.... Moreover, the parol evidence rule does not exclude proof that the writing omits a fundamental assumption upon which the agreement is made").

■ A court may not consider, however, extrinsic evidence that serves to vary, alter or contradict the contract, unless the party offering the extrinsic evidence can show that the contract was either: (a) unintegrated, or (b) ambiguous. *Peters v. Employers Mut. Casualty Co.,* Mo.Supr., 853 S.W.2d 300, 302 (1993).

> In the absence of fraud, duress, mistake or mental incapacity, an integrated unambiguous written contract may not be varied, altered or contradicted by parol or extrinsic evidence, and all prior or contemporaneous agreements are conclusively presumed to have been merged into the written contract, which itself becomes and is the single and final memorial of the understanding and intention of the parties.

*Emerick v. Mutual Benefit Life Ins. Co.,* Mo.Supr., 756 S.W.2d 513, 522 (1988) (en banc) (quoting *Campbell v. Dixon,* Mo.App., 647 S.W.2d 617, 620 (1983)).

The fundamental question that this appeal presents is "when does interpretation cease and when does variance begin[?]" *Jake C. Byers v. J.B.C. Inv.,* Mo.App., 834 S.W.2d 806, 814 (1992). Monsanto alleges that Aickin's telexes and writings serve to show how the parties interpreted the language when they entered into the insurance contract. IIC claims that the writings vary or contradict the contract.[5] In this case, however, it appears that the writings were an interpretive device, and as such, should have been considered.

---

**5.** IIC originally contended that regardless of whether the writings interpret or vary the contract, Missouri law prohibits its introduction. IIC's contention can be disposed of in summary fashion. The authorities IIC relies upon simply do not stand for this proposition. *See Ortbals v. Director of Revenue,* Mo.Supr., 871 S.W.2d 435 (1994) (parol evidence rule prohibits the introduction of oral evidence to contradict terms); *Peters v. Employers Mut. Casualty Co.,* Mo.Supr., 853 S.W.2d 300 (1993) (oral testimony rejected when offered by insurer to contradict policy language); *Peterson v. Continental Boiler Works,* Mo. Supr., 783 S.W.2d 896 (1990) (oral evidence

Monsanto admittedly was concerned about the application of Exclusion 7(a) and inquired of the underwriter whether it would apply to sold waste streams. The underwriter, on various occasions, responded that Exclusion 7(a) did not apply to sold waste streams. Both Monsanto and the underwriter had this understanding of the meaning of the text prior to signing the contract. Admission of these writings would help the court interpret the intent of both parties prior to entering into the contract and would assist in the determination of their understanding of the meaning of the words in the contract.[6]

## IV. CONCLUSION

This Court has carefully reviewed Missouri law concerning the admission of extrinsic evidence upon consideration of an integrated, unambiguous insurance contract. Missouri law allows for the introduction of extrinsic evidence to interpret this insurance contract. Therefore, the Superior Court erred when it excluded Monsanto's written evidence and granted IIC summary judgment. Accordingly, the Superior Court's grant of summary judgment to IIC is **REVERSED** and the case is **REMANDED** for proceedings consistent with this opinion.

---

rejected when offered to vary contract valuation method). *Compare Monsanto Co. v. Aetna Casualty & Sur. Co.*, Del.Super., No. 88C–JA–118, Ridgely, P.J., 1993 WL 563253 (Dec. 9, 1993), *aff'd*, Del.Supr., Hartnett, J., 653 A.2d 305 (1994) (ORDER) (extrinsic evidence which would have served to contradict the written contract inadmissible under Missouri law).

**6.** Monsanto also contends that Exclusion 7(a) is either patently or latently ambiguous, and as such, requires the introduction of the extrinsic evidence. Although Missouri law does permit the introduction of extrinsic evidence in instances of ambiguous clauses, Monsanto has not demonstrated that the clause is either patently ambiguous or latently ambiguous. Monsanto claims that the clause is ambiguous because of prior written evidence. Missouri law holds that a clause is patently ambiguous, however, only if there is more than one reasonable interpretation of its meaning. Here, there can be no such other interpretation unless the extrinsic evidence is admitted. Further, a latent ambiguity does not result merely because pre-contract discussion would lead to a different result than does the contract. *Byers*, 834 S.W.2d 806.